UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

CONNIE E. BIGGS,                    )
                                   )
            Plaintiff              )
                                   )
        v.                         ) Case No. 4:10 cv 52
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security    )
                                   )
            Defendant              )

REPORT AND RECOMMENDATION

This matter is before the court on the Petition for Judicial
Review of the decision of the Commissioner of Social Security
filed by the plaintiff, Connie E. Biggs, on June 10, 2010.  For
the reasons set forth below, this court **RECOMMENDS** that the
decision of the Commissioner be **AFFIRMED.**

Background

The claimant, Connie E. Biggs, filed an application for
Disability Insurance Benefits and for Supplemental Security
Income on October 18, 2006.  Her claim initially was denied on
February 26, 2007, and again denied upon reconsideration on May
21, 2007.  (Tr. 61, 67-69)  Biggs requested a hearing before an
Administrative Law Judge ("ALJ").  (Tr. 73-74)  A video hearing
before ALJ Deborah A. Arnold was held on July 10, 2009, at which
Biggs, Rita Wells, a friend of the claimant, and vocational
expert Howard D. Steinberg testified.  (Tr. 29-56)

On December 4, 2009, the ALJ issued her decision denying benefits. (Tr. 12-22) The ALJ found that Biggs was not under a disability within the meaning of the Social Security Act from July 7, 2004, through the date she issued her decision. (Tr. 12) Following a denial of Biggs' request for review by the Appeals Council, she filed her complaint with this court.

Biggs was born on October 2, 1966, making her 43 years old on the date of the ALJ's decision. (Tr. 32, 101) At the time of the hearing, she was 5' 4" tall and weighed approximately 203 pounds. (Tr. 151) Biggs resided with her parents. (Tr. 34, 37) She only drove to the doctor. (Tr. 34) Biggs had a 12th grade education and had taken a few college classes. (Tr. 32, 34) She last worked as a grocery stocker with Meijer in October 2004. (Tr. 32-33) She began as a loss prevention coordinator, but Meijer downsized and offered her a job stocking groceries. (Tr. 33) On July 7, 2004, a floor burnisher ran over Biggs' foot while she was at work. (Tr. 199, 210) She had not worked since October 2004 because of an inability to stand or sit for long periods of time and high pain levels. (Tr. 32)

On July 19, 2004, Dr. Joseph Sliwkowski examined Biggs. She complained of a sharp, burning pain which worsened with activity, working, and walking. Dr. Sliwkowski observed that she had tenderness in several areas of her right foot, walked with an

antalgic gait, and had slight swelling. (Tr. 220) X-rays of the right foot and right heel were negative. (Tr. 214-15, 220) Dr. Sliwkowski diagnosed Biggs with a right foot contusion and right mid-foot sprain. He placed her in a cast shoe, prescribed pain medication, and limited her to pushing, pulling, and lifting no more than 10 pounds, with walking as tolerated. (Tr. 220) On July 26, 2004, Dr. Sliwkowski ordered a CT scan of her foot, placed her in a cam walker, and limited her lifting to 10 pounds. (Tr. 219)

On August 2, 2004, Dr. Sliwkowski limited Biggs to a work status of pushing, pulling, and lifting no more than 10 pounds, and walking as tolerated. (Tr. 218) On August 13, 2004, Dr. Sliwkowski noted that the CT report revealed no significant injuries. (Tr. 217) He added a limitation of no climbing stairs or ladders and recommended physical therapy. (Tr. 217) On August 27, 2004, Dr. Sliwkowski saw Biggs and continued to recommend the same limitations and to continue with physical therapy. (Tr. 216)

On September 10, 2004, Biggs complained of significant pain from her foot just touching the carpet. She stated that light touching was becoming more painful, and pain increased by the end of a workday. (Tr. 221) Dr. Sliwkowski diagnosed Biggs with "[p]ossible reflex sympathetic dystrophy [RSD] i.e. chronic

regional pain syndrome type 2." (Tr. 221) He prescribed aggressive physical therapy, Prednisone, and Ultram and also limited her work status to 15 minutes of standing per hour. (Tr. 221-22) On September 16, 2004, orthopedist Dr. Peter Torok observed that recent images of her right foot showed signs consistent with RSD. (Tr. 210-215) On September 24, 2004, Dr. Sliwkowski limited Biggs to sedentary work with standing or walking a maximum of 20 minutes per hour and no exposure to temperatures below 50 degrees. (Tr. 232) In October 2004, Dr. Torok administered a nerve block, which reduced Biggs' pain for one day. (Tr. 233) On October 11, 2004, Dr. Sliwkowski noted that Biggs should remain out of work with her full focus on recovery. (Tr. 233-34)

From October 2004 through January 2005, Dr. Sliwkowski referred Biggs to acupuncture with Dr. Mark Griffith, chiropractic treatment with Dr. James Pucka, nerve block injections with Dr. Ferdinand Ramos, and aquatic therapy. He also increased her dosage of Neurontin and Ultram. (Tr. 233-244, 282-290, 340-343, 510) On October 18, 2004, Biggs stated that the aquatic physical therapy was very soothing and helpful. (Tr. 236) In November 2004, Dr. Sliwkowski noted a significant improvement in symptoms on a regimen of chiropractic care, acupuncture, and nerve blocks, and Biggs reported several days of relief. (Tr. 238)

4

On December 6, 2004, Biggs reported no relief from a nerve block, but Dr. Sliwkowski was optimistic because she reported two days of relief after acupuncture and chiropractic treatment and she showed increased endurance and strength in aquatic therapy. (Tr. 242) He continued this regimen. (Tr. 242, 302-305, 311-315, 320). In January 2005, Dr. Sliwkowski maintained the regimen and added Baclofen and Effexor to Biggs' Neurontin. (Tr. 244, 302-305, 308-310) Biggs remained off work. (Tr. 244)

In January 2005, Dr. Griffith observed that Biggs had increased tenderness in her right ankle and foot with diminished, but functional range of motion, and that she walked with a somewhat antalgic gait, but without assistance. (Tr. 333) He limited her work restrictions to sedentary work with no lifting, carrying, or walking. (Tr. 333-34)

On February 18, 2005, Dr. Sliwkowski and Dr. Pucka received a call from Biggs' friend stating that she was concerned about Biggs harming herself. (Tr. 248) Biggs came into the office, and she talked with Dr. Sliwkowski and Dr. Pucka. After a discussion with the doctors, Biggs stated that she felt better and had no intentions of harming herself or others. (Tr. 248) On February 19, 2005, Biggs' friend feared she might harm herself, and Dr. Sliwkowski and Dr. Pucka referred Biggs to the emergency room, where it was determined that she was not a threat

to herself or others.  (Tr. 248, 270-275, 471-476)  On February
24, 2005, Dr. Sliwkowski referred her to psychologist Gregory
Hale.  (Tr. 249)  In February and March 2005, Dr. Sliwkowski
continued Biggs' acupuncture and chiropractic treatment, pre-
scribed Cymbalta in place of Effexor, and added Klonopin to her
Neurontin and Baclofen.  (Tr. 246-252, 296-301)

On February 25, 2005, Dr. Hale performed a psychological
evaluation of Biggs in connection with her worker's compensation
claim.  (Tr. 344-350)  Biggs reported that acupuncture and chiro-
practic care were beneficial, that her medications were the only
thing that helped to control her most significant pain, that
injections provided only brief relief, and that aquatic therapy
was helpful.  (Tr. 345)  She indicated that she could stay active
for 30 to 60 minutes before her pain increased.  Biggs noted that
she was trained in martial arts and was using the training in an
attempt to decrease her pain.  (Tr. 345)

Biggs also told Dr. Hale that she recently was upset and
experienced a brief period of suicidal ideation.  (Tr. 346)  She
denied that she had any serious thought to engage in self-harm.
She also reported no previous episodes of mood disorder and
indicated that her current mood was good.  (Tr. 346)  Biggs noted
that the only significant change in her life was the fact that
she moved back from spending six months in Germany immediately

6

prior to the work-related injury. She had been living with her
parents since returning to the United States. (Tr. 346) Biggs
was planning on taking college classes at Purdue in the summer or
fall of 2005. (Tr. 347) She indicated that she felt she was
dealing with her pain "very well." (Tr. 347)

Dr. Hale observed that Biggs was oriented to person, place,
time, and situation. (Tr. 346) Biggs reported that she had some
short term memory issues which she attributed specifically to her
use of Neurontin. Dr. Hale reported no signs of psychosis,
delusions, or hallucinations. (Tr. 346) He noted that Biggs
made an effort to depict herself in an overly favorable manner.
(Tr. 348) Dr. Hale found that based on Biggs' symptom report,
she had few, if any, psychological symptoms. He reported that
this was unusual for chronic pain patients. (Tr. 348)

In his summary of psychometric assessment, Dr. Hale noted
that Biggs described a distinct effort to suppress or minimize
the expression of anger and frustration that may be experienced.
(Tr. 348) Dr. Hale stated that some of the anxiety that Biggs
was experiencing was likely a reflection of her anger, rather
than directly related to anxiety. (Tr. 348) Dr. Hale also
indicated that symptoms of depression or a mood disorder also
were reported in a limited way. (Tr. 348) Biggs reported that
her health significantly impacted her ability to work. However,

she did not describe any other area of her life outside of her participation in recreation, leisure activity, and sleep as affected by her health related problems. (Tr. 348-49) Dr. Hale reported Biggs' intellectual skills in the average to above average range. (Tr. 349)

Dr. Hale observed that Biggs displayed frustration regarding her chronic pain and inability to resolve her health problems. (Tr. 349) Biggs also displayed difficulty coping with the adjustment issues associated with the consequences of her July 2004 work-related injury. Dr. Hale identified psychological concerns directly related to Biggs' injury. (Tr. 349) He assigned her a Global Assessment Function (GAF) score of 60.[1] (Tr. 350) Dr. Hale recommended a course of psychoeducational treatment which would focus on addressing chronic pain from a behavioral perspective and would help develop a more skillful way of dealing with changes resulting from the injury. (Tr. 349)

On April 12, 2005, Dr. Robert Gregori, M.D., examined Biggs on referral from Dr. Sliwkowski. (Tr. 335-339) He noted that the results were consistent with RSD. (Tr. 338, 362-63) He

---

[1]  The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnosis and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV-TR). The established procedures require a mental health professional to assess an individual's current level of symptom severity and current level of functioning, and adopt the lower of the two scores as the final score. *Id.* at 32—33. A GAF score ranging from 41—50 indicates serious symptoms; scores ranging from 51—60 indicate moderate symptoms; and scores ranging from 61—70 indicate mild symptoms. *Id.*

observed that she had persistent and fairly sensitive pain that precluded her from progressing with functional activities, that she had maintained full mobility, but that she only had a slight decrease in muscle mass. (Tr. 338) He added Duragesic on a trial basis and recommended that her other medications remain unchanged. (Tr. 338)

On May 25, 2005, Dr. Gregori determined that Biggs could perform light duty work, should lift no more than 20 pounds, and should perform primarily sit-down work with standing 10 minutes in duration or no more than two hours per work day and no more than 20 minutes per hour. He felt that Biggs could start at four hours per day and gradually increase to eight hours per day over one to two weeks as tolerated. He suggested that the restrictions should be permanent. (Tr. 353) Dr. Gregori stated that he did not expect her condition to resolve but that it would not worsen as long as she continued with the exercise and medications which seemed to be helpful. (Tr. 353) He released her from his care with a permanent partial impairment rating of 20% of the lower right extremity and 8% of the whole person. (Tr. 353)

On May 31, 2005, Dr. Hale indicated that Biggs showed significant improvement in her affect as well as steady participation in daily activities. (Tr. 441) He stated that she had reached maximum medical improvement with regard to her psycholog-

ical status.  Dr. Hale also stated that although some residual
psychological effects associated with her chronic pain condition
existed, he did not find any corresponding psychological impair-
ments.  He gave Biggs a zero percent permanent partial impairment
rating for loss of function associated with a behavioral or
mental disorder.  (Tr. 441)

On August 24, 2005, Dr. Scott Taylor examined Biggs at the
request of the Worker's Compensation Board.  (Tr. 426)  Biggs
reported that acupuncture and chiropractic care were her only
helpful treatments and that nerve blocks helped for about two
weeks.  (Tr. 426)  Dr. Taylor confirmed the diagnosis of RSD in
her right lower extremity, agreed with Dr. Gregori's work re-
strictions, and concluded that she was at maximum medical im-
provement. (Tr. 427)

On September 1, 2005, Dr. Sliwkowski diagnosed Biggs with
systemic spreading of RSD of the right and left lower extremity.
He opined that she was totally disabled and that she could not
perform a consistent level of even sedentary work due to periods
of intense pain and flare-ups.  (Tr. 181)  On September 29, 2005,
Dr. Sliwkowski prescribed Lyrica in place of Neurontin and began
Biggs on a trial prescription of Calcitonin nasal spray.  (Tr.
191)  On October 27, 2005, Biggs stated that her new medication
was helping, that she still was able to walk only five minutes

without changing positions or sitting down, and that her driving toleration was about 20 minutes. (Tr. 190) Dr. Sliwkowski increased her Lyrica. (Tr. 190)

On November 28, 2005, Dr. Sliwkowski reported that Biggs' RSD was in both lower extremities and could spread to her right upper extremity. (Tr. 189) He concluded that Biggs' unpredictable pain and inability to control it significantly did not allow her any consistent level of functioning. (Tr. 189) Dr. Sliwkowski continued her current maintenance treatment including Lyrica. (Tr. 189) He changed Cymbalta to a once a day dose of 30 milligrams and suggested Biggs continue with Miacalcin spray. (Tr. 189)

In February 2006, Dr. Sliwkowski diagnosed Biggs with RSD/chronic regional pain syndrome type 1 with systemic spread. (Tr. 186) Biggs stated that she was experiencing some right facial numbness and that she spent 2/3 of the day in a recliner due to marked difficulty with sitting. Dr. Sliwkowski suggested narcotic pain medication, but Biggs indicated that she could not tolerate it. He continued to believe that she was totally disabled and referred her to counseling for coping with the pain. (Tr. 186)

In March 2006, Biggs complained that she was having more consistent symptoms in her upper extremities. (Tr. 196) On

April 24, 2006, Biggs continued to have progressive symptoms, including difficulty with simple activities such as brief walking and using fine motor activities. (Tr. 194) Dr. Sliwkowski noted that acupuncture, chiropractic adjustment, and medications were somewhat helpful, but they did not keep some of Biggs' symptoms abated. He concluded that she was totally and permanently disabled and that any significant functional improvement was highly doubtful. (Tr. 194)

In July 2006, Dr. Sliwkowski observed that Biggs walked with a shuffling gait and clenched her hands. He could not get full extension of her joints. He noted that long term full function disability was expected. (Tr. 192) In October and November 2006, Dr. Sliwkowski observed that Biggs had decreased grip strength in her hands, did not expect her to have significant functional gains, and indicated that treatment options were limited. (Tr. 197, 268)

In October 2006, orthopedist Dr. John McLimore, M.D., examined Biggs, who complained that every point on her body hurt, that nothing relieved it, and that almost any type of movement or activity bothered her. (Tr. 415) She indicated that she was able to do some housework and some leisure activities. (Tr. 415) Dr. McLimore noted that when he touched her lightly with his finger-tips, she had a profound reactive response with a loud groan,

moaning, sighing, and a burst of discomfort at times.  However,
Dr. McLimore also noted that there were some inconsistencies with
this.  (Tr. 416)  Biggs was able to come off the exam table with
her friend holding onto her upper extremity without displaying
any intolerance to this assistance or palpation by her friend.
(Tr. 416-17)  Dr. McLimore also noted that one of his medical
assistants observed Biggs outside the exam room walking without
the degree of pain behavior displayed in the exam room.  (Tr.
417)  He agreed with Dr. Gregori's opinion that Biggs had reached
maximum medical improvement as of May 25, 2005.  Dr. McLimore
noted that Biggs' complaints of global discomfort and whole body
pain would be a unique incident, and in light of her inconsistent
pain behavior, he would not be overly confident in the assessment
that she had globalized or bilateral spread of her complex
regional pain syndrome.  He also concluded that her subjective
complaints were somewhat disproportional to the objective find-
ings and that there could be some degree of symptom-amplifica-
tion.  (Tr. 417)  He recommended no further formal treatment
outside of the fact that she could continue with Lyrica as well
as Cymbalta.  (Tr. 417)

In December 2006, consulting psychiatrist Dr. Aldo Buonanno,
M.D., performed a mental status examination.  (Tr. 635-637)
Biggs complained of anxiety, depression, and difficulty concen-

trating due to pain.  (Tr. 635)  She indicated that she had
difficulty tending to her personal care, did not cook, clean, or
shop, and drove short distances.  (Tr. 636)  However, Biggs did
laundry and read books, but she had to re-read them.  Dr. Buo-
nanno diagnosed her with a mood disorder due to her RSD and
assigned her a GAF score of 49.  (Tr. 637)

On January 8, 2007, state agency reviewing psychologist
Kenneth Neville, Ph.D., indicated that Biggs was mildly limited
in her concentration, persistence, and pace, activities of daily
living, and social functioning.  (Tr. 648)  He noted that Biggs
had a mild decrease in concentration, that activities were
limited by her physical impairment, and that there was no evi-
dence of a severe psychological impairment.  (Tr. 650)  In May
2007, Dr. B. Randal Horton, Psy.D., reviewed the evidence in
Biggs' file and affirmed this opinion as written.  (Tr. 665)

On January 22, 2007, consulting physician Dr. Robert V.E.
Drennen, M.D., examined Biggs.  (Tr. 652-655)  Biggs stated that
she had pain and burning sensations throughout her entire body.
She reported difficulty walking and driving, being unable to hold
a pen, and taking several hours to dress.  (Tr. 652)  Dr. Drennen
noted that Biggs was unsteady, changed position from sitting to
lying with difficulty, and needed help putting on her socks.  He
also determined that her hands were in a continuously flexed

position and that flexion and extension of her arms and elbows was about 50% of the expected normal. (Tr. 654) The remainder of the range of motion tests could not be done because of her persistent complaints of pain and hypersensitivity. Dr. Drennen opined that her problems "are very protean" in nature, but he was unable to make a diagnosis or prognosis. (Tr. 654)

On February 23, 2007, state agency reviewing physician Dr. A. Lopez concluded that Biggs could lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk a total of two hours, and sit for a total of six hours. (Tr. 657-664) Dr. Lopez also opined that Biggs occasionally could climb ramps and stairs but that she never could climb ladders, ropes, or scaffolds. (Tr. 659) He cited results of Dr. McLimore's exam from October 2006. (Tr. 658) On May 20, 2007, Dr. M. Ruiz affirmed Dr. Lopez's opinion as written. (Tr. 666)

From June 2008 through September 4, 2008, Biggs received outpatient therapy from social worker Marsha Baccam. (Tr. 732-744) In August 2008, psychiatrist Dr. Mukesh Desai of Wabash Valley Hospital evaluated Biggs. (Tr. 678-682) Biggs complained of depression, social anxiety, and periodic episodes of high energy for a few hours every few weeks. (Tr. 678-79) Dr. Desai noted that Biggs walked with a painful, distinct limp. (Tr. 680) He observed that Biggs' speech seemed slightly slow but that she

15

was easy to understand.  (Tr. 681)  He diagnosed Biggs with bi-polar disorder NOS (significant depressed mood with psychotic symptoms) and anxiety disorder, NOS (panic disorder symptoms every few months and social anxiety).  (Tr. 681)  He discontinued Amitriptyline and Cymbalta, prescribed Seroquel, and continued Lyrica and Klonopin.  (Tr. 679-681)

Social worker Anne Hunte saw Biggs for therapy beginning in September 2008 through June 2009.  She generally reported that Biggs expressed a great deal of depression and anxiety that slowly improved over time.  (Tr. 708-731)  Biggs reported diffi-culty leaving her house, isolating herself, and nightmares over past sexual and physical abuse.  (Tr. 709, 715-731).  In December 2008, Hunte completed a one-page diagnosis form in which she diagnosed Biggs with post-traumatic stress disorder (PTSD) and bipolar disorder, Type I, most recent episode depressed, and assigned her a GAF score of 40.  (Tr. 704)  Hunte noted that Biggs continued to make progress but that she still struggled with the anxiety and anger from past abuse.  (Tr. 709-732)  At her most recent sessions in June 2009, Biggs reported that she was spending at least 20 hours a day in bed.  Biggs also reported that she had a recent suicidal ideation, did not have current suicidal ideation, and had four to five panic attacks per week. (Tr. 708)

From March 2009 through June 2009, psychiatrist Dr. Norris
Newton saw Biggs for medication management and mental status
examinations.  (Tr. 683-699)  He consistently reported that she
was alert, prosocial, narratively engaging, and had good eye
contact, grooming, and activities of daily living.  He also
reported that Biggs had good insight and judgment, average cogni-
tion, linear, goal-oriented thought processes, and no limitation
in her immediate and remote memory.  (Tr. 683-99)  At Biggs' last
session on June 9, 2009, Dr. Newton indicated that Biggs report-
edly had improved activities of daily living moving toward
stabilization, largely linear and goal-oriented thought process,
good insight and judgment, average cognition, good memory, and
low risk of harming herself or others.  (Tr. 683-84)  He diag-
nosed her with bipolar disorder Type I and panic disorder.  (Tr.
685)  Dr. Newton assigned Biggs a GAF score of 55, as he had done
in all but one prior session.  (Tr. 683-699)  The other GAF score
assigned was a 50 on June 2, 2009.  (Tr. 687)

At the hearing before the ALJ, Biggs testified that she was
injured at her job when a co-worker ran over her feet with a
floor burnisher.  (Tr. 32)  Her normal job consisted of stocking
groceries at Meijer, but she originally was hired as a loss
prevention coordinator.  (Tr. 33) Biggs previously worked as a
corrections officer at Tippecanoe and then became a communica-

17

tions dispatcher. (Tr. 34) She testified that she lived with her parents and that her driving was limited to going to the doctor and back. The pain in her legs, feet, and arms prevented her from holding onto the steering wheel, and her hips, knees, and feet locked up. (Tr. 34) Biggs testified that she was seeing a psychiatrist and therapist but that she still was trying to find a doctor since her insurance expired. (Tr. 35) She further testified that she was taking Lyrica for nerve pain, Cymbalta for depression, Baclofen, Seroquel, Xanax, Amitripty-line, and Levothroxine. (Tr. 36)

Biggs stated that she was seeing a counselor because she had been diagnosed with bipolar disorder, Post-Traumatic Stress Disorder, depression, and anxiety. (Tr. 36) She testified that the medicine was helping her but that she still had suicidal thoughts and depression. At times, she had trouble getting along with her parents, and she saw her friends a couple times a month. (Tr. 37) She was unable to read because she frequently lost concentration and would end up having to re-read everything that she just read. (Tr. 37-38) She spent about 15 minutes per day on the computer. (Tr. 38) Biggs stated that she did her own laundry but that it took her several hours and several days to get a few loads done. She was not allowed to cook because she

previously had dropped hot pans and glasses because she could not feel the heat or cold, as it just felt like pain. (Tr. 38)

Biggs testified that she was being treated at Wabash Valley because of her suicidal thoughts caused by pain. She said that her pain was in the constant nine to ten pain range every day. (Tr. 38) She said that as a result of her work accident, she was diagnosed with reflex sympathetic dystrophy. (Tr. 39) The RSD started in her right foot and spread up her leg. She could not stand any kind of touch to the leg. (Tr. 39) Biggs had her hands clamped in and stated that the muscles in her arms were pulling her fingers. (Tr. 40) She testified that her concentration was not the best and that she could not sit for very long. (Tr. 41) Her hips were so painful and that touching the chair was painful. She stated that she would not be able to sit for two hours at a time. (Tr. 41)

Biggs testified that she did not think she could work anywhere. (Tr. 42-43) She felt like she had millions of needles poking into her. (Tr. 43) Biggs stated that she thought her Post-Traumatic Stress Disorder was a result of her injury and that she was raped by 13 men when she was 18 years old. (Tr. 43-44) She described her pain during the hearing, on a scale of one to ten, as a ten. (Tr. 44)

Biggs' friend, Rita Wells, testified on Biggs' behalf at the hearing before the ALJ. (Tr. 45-47) Wells stated that she had known Biggs for more than 20 years. (Tr. 45) She stated that Biggs was a very outgoing and vibrant person before her injury. (Tr. 46) Wells testified that Biggs did not want to move and was afraid to go in public and that she felt like she had to protect Biggs when they went in public together. She also stated that she had seen Biggs have a panic attack by just going near a floor polisher. (Tr. 46) The ALJ asked Wells about changes with Biggs in the prior year. (Tr. 47) Wells responded that she literally had to drag Biggs out of the house just to get her out. Wells talked about how much Biggs loved Wells' children but that she could not stand to have them touch her. She stated that Biggs' depression had gotten worse and that her suicidal thoughts were to the point where she was uneasy about letting Biggs see her children. (Tr. 47) The ALJ asked Wells whether Biggs was able to sit up for two hours at a time, and Wells responded that she could not. She went on to state that Biggs was constantly on the move and that she spent about 20 hours in bed per day. (Tr. 47)

Vocational expert Howard Steinberg was last to testify. (Tr. 48) He stated that he reviewed Biggs' background and had a question about what her job as a loss prevention officer at Meijer consisted of. Biggs responded that she walked the sales

floor watching for people who were stealing.  (Tr. 48-49)  Biggs
stated that she would be on her feet for eight hours and would
sometimes have to chase people across the store.  (Tr. 49)  She
also testified that she had to write reports for the police
department detailing incidents in the store.  The VE also asked
for a description of the job that Biggs performed while working
for Caterpillar.  (Tr. 49)  Biggs stated that she installed 40
pound bearing caps and worked as an administrative assistant for
the training department.  (Tr. 50)

The ALJ posed a series of hypothetical questions.  (Tr. 52-
53)  First, the ALJ asked the VE whether an individual could
perform any of Biggs' prior jobs, assuming that the individual
could lift 20 pounds occasionally and 10 pounds frequently, but
could stand or walk for only two hours in an eight-hour day,
occasionally climb ramps or stairs, balance, stoop, kneel,
crouch, crawl, and never climb ladders, ropes, or scaffolds.
(Tr. 52)  The VE responded that the dispatch job, the communica-
tions officer job, and the administrative assistant job all could
be performed within the limitations posed by the hypothetical.
(Tr. 52)  The ALJ modified the hypothetical and asked if the
individual was limited to performing only simple, repetitive
tasks, whether that changed the response.  The VE stated that

with those limitations, there would be no past relevant work that could be performed. (Tr. 52)

The ALJ then asked the VE to consider what other jobs an individual could do with the same limitations above, and Biggs' work history, including a high school education. (Tr. 52) The VE responded that there would be a variety of sedentary, un-skilled assembly jobs such as an eyeglass assembler (300,000 national, 950 Indiana). (Tr. 52) The VE further stated that there also would be clerical jobs such as a charge account clerk (57,000 national, 200 Indiana) that were sedentary and unskilled. (Tr. 52-53) The ALJ's next hypothetical posed a further limita-tion of occasional fingering, and the VE was asked whether that changed the response. (Tr. 53) The VE responded that the entire job base he described would be compromised and that there would be no jobs such a person could do. (Tr. 53)

Finally, the ALJ asked the VE to consider whether his responses would change assuming the individual only was limited in that she could sit for only ten minutes at a time. (Tr. 54) The VE stated that the limitation would eliminate performance of any of the sedentary jobs that he listed. The ALJ further asked if there would be any jobs that such a person could do. The VE responded that there would not be any jobs such a person could do if considered with the rest of the hypothetical. (Tr. 54)

In her decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. In step one, the ALJ found that Biggs had not engaged in substantial gainful activity since July 7, 2004, her alleged onset date. (Tr. 14) At step two, the ALJ found that Biggs had the following severe impairment: reflex sympathetic dystrophy of the right foot. The ALJ stated that the impairment had more than a minimal limitation on the claimant's ability to perform basic work activities. The ALJ also stated that Biggs' medically determinable mental impairment of affective disorder(s) did not cause more than minimal limitation in Biggs' ability to perform basic mental work activities and was not severe. (Tr. 14) The first, second, and third functional areas included activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. 15) Biggs had a mild limitation in all of the first three functional areas. The fourth functional area was episodes of decomposition. Biggs experienced no episodes of decomposition which had been of extended duration. (Tr. 15) At step three, the ALJ found that Biggs' impairments did not meet or medically equal one of the listed impairments. (Tr. 16)

In determining Biggs' RFC, the ALJ stated that she considered the entire record and found that Biggs had the residual functional capacity to perform the full range of sedentary work,

lift 10 pounds occasionally and less than 10 pounds frequently, stand and walk for brief periods for a total of two hours in an eight hour day, and sit for the remainder of the workday. (Tr. 16-17) The ALJ stated that the finding considered all symptoms and the extent to which the symptoms reasonably could be accepted as consistent with the objective medical evidence. (Tr. 17)

In considering Biggs' symptoms, the ALJ utilized the following two-step process. First, she considered whether there was an underlying medically determinable physical or mental impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the pain or symptoms. Second, the ALJ evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which the ability to do basic work activities was affected. (Tr. 17)

In reaching this determination, the ALJ first discussed Biggs' work accident where her foot was run over by a floor burnisher. Dr. Joseph Sliwkowski examined Biggs' foot, observed x-rays of the right foot and heel as negative, and diagnosed Biggs with a right foot contusion and right mid foot sprain. (Tr. 17) Dr. Sliwkowski saw Biggs one week later and limited her work activities to lifting, pushing, and pulling 10 pounds, limited walking, and no climbing stairs or ladders. Dr. Sliwkow-

ski saw Biggs September 7, 2004, and noted possible reflex sympathetic dystrophy as a diagnosis. (Tr. 17)

On October 11, 2004, Biggs received an examination and a nerve block from Dr. Torok, which was successful in limiting Biggs' pain for a day. (Tr. 18) Dr. Sliwkowski noted treatments over the next several months including acupuncture, chiropractic, physical therapy, water exercises, and change in medication. (Tr. 18) On February 19, 2005, Dr. Sliwkowski and Dr. Puca received phone calls from a friend of Biggs' stating that she felt Biggs might harm herself. Dr. Sliwkowski saw Biggs and referred her to an emergency room where it was determined that she was not a threat to herself or others. Dr. Sliwkowski noted that counseling should occur. (Tr. 18)

On January 11, 2005, Dr. Griffith, an orthopedist, concluded that Biggs could do sedentary work with some limitations. (Tr. 18) On March 25, 2005, Dr. Gregori saw Biggs and had no treatment recommendations except that Biggs remain as active as possible. He reported his findings to the Worker's Compensation Board. He suggested light duty with no lifting over 20 pounds, primarily sit-down work, with standing 10 minutes in duration or no more than 2 hours per work day and not more than 20 minutes per hour. (Tr. 18) The Worker's Compensation Board recommended that Biggs undergo an independent medical evaluation from Dr.

Scott Taylor on August 24, 2005.  Dr. Taylor confirmed the diagnosis of reflex sympathetic dystrophy.  (Tr. 18)  On September 1, 2005, Dr. Sliwkowski diagnosed Biggs with a systemic spread of RSD.  He determined that she was totally disabled and that periods of intense pain and severe flare-ups kept Biggs from maintaining any level of consistent work activity.  (Tr. 18)  On November 28, 2005, Dr. Sliwkowski noted that both lower extremities were involved with a potential spread to Biggs' right upper extremity.  He continued to believe that Biggs was totally disabled.  (Tr. 18)

On October 11, 2006, Dr. McLimore examined Biggs at the request of the State agency.  (Tr. 19)  He felt that Biggs' subjective complaints were somewhat disproportionate to the objective findings and that there could be some degree of symptom amplification.  He was unable to assess her range of motion fully but noted variable and inconsistent results.  He reported that she ambulated with an awkward and inconsistent antalgic gait pattern.  Dr. McLimore also noted that Biggs had various deliberate movements while examined in the office and exam room, but when observed outside passively by a medical assistant, that she had a normalizing gait pattern without the degree of pain exhibited during the exam.  (Tr. 19)  On January 22, 2007, Dr. Drennen observed that Biggs' problems were very protean in manifestation

and expressed no opinion as to her limitations.  (Tr. 19)  On February 2, 2007, State agency medical consultant Dr. Lopez, found that Biggs' complaints regarding the nature and severity of the impairment-related symptoms and functional limitations were not supported by the medical and other evidence.  (Tr. 19)  Dr. Lopez set forth the following limitations: ability to lift and/or carry 20 pounds occasionally, lift 10 pounds frequently, stand and/or walk at least 2 hours in an 8-hour day, and sit for 6 hours in an 8-hour day.  Another State agency consultant, Dr. Ruiz, reviewed and affirmed Dr. Lopez's assessment.  (Tr. 19)

After consideration of the evidence, the ALJ found that Biggs' medically determinable impairments reasonably could be expected to cause the alleged symptoms.  The ALJ went on to state that the statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible because they were inconsistent with the residual functional capacity assessment.  (Tr. 19)  The ALJ stated that Biggs had not been hospitalized for treatment of pain or the underlying condition.  She reviewed reports stating that Biggs was well groomed and able to take care of her personal needs at medical and mental appointments.  Biggs lived with her parents who did all the housework, except laundry.  There was no indication that Biggs' parents did the housework due to Biggs' injury.  (Tr. 20)  Biggs was reported

to be oriented, alert, and engaged at most of her mental health appointments. Biggs saw a psychologist, Dr. Hale, and reported few, if any, psychological symptoms. Dr. Hale noted that the report was in contrast to those usually reported by chronic patients. (Tr. 20)

The ALJ summarized observations of Biggs' medical history. She stated that Biggs' varied responses were inconsistent with the responses of someone suffering the high level of pain and limitations Biggs asserted. The ALJ noted that Biggs told her psychologist that, "[s]he is in control of her life and her pain experience." (Tr. 20) The ALJ noted that several doctors were prevented from completing full range of motion examinations because of discomfort, but that a friend physically assisted Biggs during an examination without any pain response. (Tr. 20) The ALJ found that the symptoms were consistent with a diagnosis of RSD but that Biggs' allegations as to the intensity, persistence, and limiting effects of the symptoms were not fully credible and consistent with the record. Biggs' friend, Rita Wells, testified at the hearing that Biggs spent 20 hours plus in bed per day, which was not consistent with the record as a whole. (Tr. 20) The ALJ discounted Dr. Sliwkowski's opinion that Biggs was disabled, noting that the opinion was not afforded the weight normally given to a treating physician because the opinions were

not consistent with findings and the record as a whole. (Tr. 20) The ALJ gave more weight to Dr. McLimore, Dr. Gregori, Dr. Taylor, and Dr. Griffith as examining specialists. (Tr. 20-21) She noted that their opinions stated that Biggs was able to perform essentially sedentary work, which was consistent with the record as a whole. (Tr. 20-21) Also, the ALJ noted that two State agency consultants concluded that Biggs had the capacity to do light duty work. (Tr. 21) The opinion of Dr. Puca, a chiropractor, was discounted as an opinion which was not an acceptable medical source in disability claims. (Tr. 21)

With the RFC determined, at step four the ALJ found that Biggs was capable of performing past relevant work as a dispatcher and administrative assistant. (Tr. 21) The past relevant work did not require the performance of work-related activities precluded by Biggs' residual function capacity. The ALJ further noted the VE testified that an individual who was further limited to performing only simple repetitive tasks with the same age, education, and work experience as Biggs would be able to perform the following jobs: assembly, eye glass (300,000 jobs nationally), and charge account clerk (57,000 jobs nationally). (Tr. 21)

On February 2, 2010, Biggs provided additional evidence to the Appeals Council. (Tr. 745-748) She and her parents provided

letters detailing and updating her situation. (749-754) Biggs provided medical records from Dr. Ramos from an appointment on January 5, 2010. (Tr. 757-770) These post-date the ALJ's decision, and the remaining records Biggs submitted after the ALJ entered her decision appear to be duplicates of records that were before the ALJ. (Tr. 771-790) Dr. Ramos observed that Biggs' hand grasps were weak and that she had a tender low back, hips, knees, and ankles. (Tr. 757) He recommended that she continue with Lyrica and Baclofen, Zoloft, Seroquel, Xanax, and Remeron. Dr. Ramos also recommended that Biggs pace activities, enroll in an exercise program, enroll in a weight loss program, and continue seeing a psychiatrist. (Tr. 757)

Biggs provided additional treatment notes from Dr. Newton from May 2, 2009 to July 7, 2009. (Tr. 804-813) On June 23, 2009, Dr. Newton observed that Biggs had an anxious and somewhat dysphoric mood and affect, linear thought process, no suicidal ideation or psychosis, with good judgment, insight, and cognition. Dr. Newton gave a GAF score of 55. (Tr. 806)

On July 7, 2009, Dr. Newton observed that Biggs was stable on her current medication regimen. Biggs reported doing well on her current medications and being stable. Dr. Newton reported that her mood was somewhat anxious, her thought content was negative for suicidal ideations, and there was no evidence of

psychosis.  Dr. Newton maintained the GAF score of 55+.  (Tr. 804)

Biggs provided notes from appointments in August, September, November, and December 2009.  (Tr. 796-803)  On August 4, 2009, Dr. Jimmy Vargas observed that Biggs seemed depressed and anxious with occasional suicidal ideas.  (Tr. 802)  He started her on a small dose of Zoloft with a plan to cut down on Cymblata.  (Tr. 802-03)  On September 15, 2009, Dr. Vargas increased Zoloft and maintained a GAF score of 55.  (Tr. 798)  On November 11, 2009, Biggs reported that she was depressed on and off and had thoughts of death, but she denied suicidal or homicidal thoughts or ideations.  (Tr. 797)  Dr. Rama Embar increased her Zoloft.  (Tr. 797)  Biggs also provided notes from an appointment on December 14, 2009, which was after the ALJ's decision.  (Tr. 796)  Dr. Embar reported that Biggs had thoughts of death but no suicidal ideations or plans.  Dr. Embar continued with the same regimen of medication.  (Tr. 796)

Biggs provided treatment notes from July 2009 to October 2009 from Anne Hunte, LCSW.  (Tr. 817-825)  In July 2009, Biggs complained of increased depression and anxiety due to increased pain and an upcoming disability hearing.  (Tr. 822-25)  On August 27, 2009, Biggs reported that between appointments, she rarely left her house.  (Tr. 820)  On September 21, 2009, Biggs reported

31

that she had not left the house for nine days.  She said that her physical pain was increasing, which increased her depression and anxiety.  (Tr. 818)  Hunte opined that Biggs was slipping into a deeper depression because of her increased physical pain and lack of support from her family and friends.  (Tr. 818)  On October 5, 2009, Hunte and Biggs discontinued the treatment plan objective of dealing with her past abuse.  (Tr. 817)

Biggs provided treatment notes from December 14, 2009, December 28, 2009, and January 6, 2010, all of which post-dated the ALJ's decision.  (Tr. 814-816)  On December 14, 2009, Hunte completed a diagnosis form in which she indicated that Biggs' current GAF score was a 40, and highest GAF score in the past year was a 43.  (Tr. 792)  Biggs reported that she had a history of sexual and physical abuse and that her anxiety and depression caused her to isolate herself almost all of the time.  (Tr. 793) Hunte reported that Biggs' mental state had worsened over the last year.  (Tr. 794)  She also reported that Biggs had frequent suicidal ideations, but no plan, and a fragile mental state. Biggs reported that she rarely left her house, sometimes going weeks without leaving her bedroom.  (Tr. 794)  Hunte indicated diagnoses as Bipolar I, panic disorder with agoraphobia, and post-traumatic stress disorder.  (Tr. 794-95)

Hunte wrote a letter on January 21, 2010, which post-dated the ALJ's decision.  (Tr. 830)  She indicated that she had seen Biggs 37 times since September 22, 2008, for individual therapy. Hunte reported that by January 2009, Biggs had become too emotionally unstable to address her trauma, so Hunte stopped talking about it and moved towards working on ways to manage Biggs' depression and anxiety.  Hunte observed that Biggs continued to spiral downward, becoming more severely depressed and so anxious that she almost never left her house except for appointments. She indicated that for the past eight months no coping skills helped Biggs.  Hunte noted that "It seems that so much of her energy is tied up in coping with her RSD that she has nothing left to deal with her depression and anxiety . . . . [I]t continues to debilitate her as much if not more than RSD."  (Tr. 830)

### Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Sub-

stantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* **Consolidated Edison Company v. NLRB**, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* **Jens v. Barnhart**, 347 F.3d 209, 212 (7th Cir. 2003); **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. **Rice v. Barnhart**, 384 F.3d 363, 368-69 (7th Cir. 2004); **Scott v. Barnhart,** 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." **Lopez**, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the bur-

den of establishing disability.  20 C.F.R. §§404.1520, 416.920.
The ALJ first considers whether the claimant is presently em-
ployed or "engaged in substantial gainful activity." 20 C.F.R.
§§404.1520(b), 416.920(b).  If she is, the claimant is not
disabled and the evaluation process is over.  If she is not, the
ALJ next addresses whether the claimant has a severe impairment
or combination of impairments which "significantly limits . . .
physical or mental ability to do basic work activities."  20
C.F.R. §§404.1520(c), 416.920(c).  Third, the ALJ determines
whether that severe impairment meets any of the impairments
listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P,
app. 1.  If it does, then the impairment is acknowledged by the
Commissioner to be conclusively disabling.  However, if the
impairment does not so limit the claimant's remaining capabili-
ties, the ALJ reviews the claimant's "residual functional capac-
ity" and the physical and mental demands of her past work.  If,
at this fourth step, the claimant can perform her past relevant
work, she will be found not disabled. 20 C.F.R. §§404.1520(e),
416.920(e).  However, if the claimant shows that her impairment
is so severe that she is unable to engage in her past relevant
work, then the burden of proof shifts to the Commissioner to
establish that the claimant, in light of her age, education, job
experience and functional capacity to work, is capable of per-

forming other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §§404.1520(f), 416.920(f).

Biggs raises two challenges to the ALJ's denial of disability benefits.  First, Biggs argues that the ALJ erred by holding that her mental impairment was not severe.  Second, Biggs argues that the ALJ improperly evaluated her credibility.

Biggs first argues that the ALJ erred at step three by finding that her mental impairment did not meet or medically equal Listing 12.00(C).  For a claimant to show that she met a listed impairment, she must show her impairment met each required criterion and bears the burden of proof in showing her condition qualified.  *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). A condition that met only some of the required medical criteria, "no matter how severely," would not qualify as meeting a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

Section 12.00(A) of the Social Security regulations describes the structure of the Mental Disorder Listings.  To show that she met the Mental Disorder Listing, Biggs must have submitted a set of medical findings that supported a diagnosis of one of the listed medical impairments.  If the claimant had met this

burden, the court must assess the severity of the impairment under Paragraph B. 20 C.F.R. §404.1520a(a).

Paragraph B sets forth the impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The claimant's functional limitations are assessed by using the four criteria set forth in Paragraph B of the Listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Listing 12.00(C); 20 C.F.R. §404.1520a(c)(3). Each functional limitation must be evaluated to determine the severity, taking into consideration "all relevant and available clinical signs and laboratory findings, the effects of [the] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." 20 C.F.R. §404.1520a(c)(1). If the degree of limitation was none or mild in the first three categories and none in the fourth, the impairment was not severe. 20 C.F.R. §404.1520a(d)(1). Otherwise, the court must determine whether the claimant met the criteria set forth by the Listing for the specific mental impairment for which she was diagnosed.

The ALJ concluded that Biggs had mild limitations in the first three areas of functional limitation and that the record

did not reflect any episodes of decompensation.  Biggs flags this
as inconsistent with the GAF rating of 55 which Dr. Newton
assigned, indicating moderate symptoms rather than mild.  How-
ever, the ALJ must consider the record as a whole, and one sub-
jective score or test result is not determinative of the entire
claim.  The question is whether the ALJ had substantial support
for her determination based on the record as a whole.

In support of her decision, the ALJ cited a diagnostic
interview with Dr. Hale on March 9, 2005, where it was noted that
Biggs was having trouble coping with adjustment issues associated
with the consequences of her work injury.  (Tr. 15)  Dr. Hale's
assessment stated that, "[b]ased on her symptom report she is
having few, if any, psychological symptoms."  Dr. Hale noted that
this was in contrast to what was usually reported by chronic pain
patients.  (Tr. 15)  Dr. Hale recommended psychological treatment
focusing on a way to deal with her injury.  (Tr. 16)  The ALJ
also cited reports from several other doctors.  On December 29,
2006, Dr. Bounanno conducted a mental status examination at the
request of the State agency.  He diagnosed Biggs with a mood
disorder.  (Tr. 16) On January 8, 2007, Dr. Kenneth Neville,
Ph.D., a psychological consultant to the State agency, reviewed
the medical evidence and found that Biggs had mild degrees of
limitation in activities of daily living.  He found that she

38

drove, read, and did laundry.  He also found that Biggs was able to maintain social functioning and noted a mild decrease in concentration, but he explained that Biggs was able to maintain persistence and pace with no limitation.  He noted no episodes of decompensation of extended duration.  (Tr. 16)  The ALJ stated that Dr. B. Randal Horton, Psy.D. affirmed Dr. Neville's assessment on May 17, 2007.  (Tr. 16)  Dr. Newton, a psychiatrist, saw Biggs for medication reviews from March 2009 through June 9, 2009, and generally reported her to be alert and oriented.  The ALJ also cited to Dr. Newton's report stating that Biggs was prosocial and narratively engaging with good insight.  He also noted no limitation of her immediate and remote recall.  (Tr. 16) Biggs reported one visit to an emergency room for assessment when her doctor became concerned that she was a risk to herself. Biggs denied the risk, was assessed, determined to not be a danger to herself or others, and was discharged from the emergency room.  (Tr. 16)

The ALJ provided a thorough explanation of the objective medical evidence she took into consideration and based her opinion upon.  The ALJ need not address every piece of evidence. *Schmidt*, 395 F.3d at 744.  Biggs has provided no authority to overturn the ALJ's decision based on one subjective score that contradicted the myriad of evidence to the contrary.  Although

Biggs argues that the GAF rating of 55 was more recent and should have been assigned greater weight, she did not submit the evidence containing the score until after the ALJ issued her decision.  Biggs also protests that additional evidence submitted after the hearing should have been reviewed and considered in determining whether she satisfied the Paragraph B criteria.

A claimant is permitted to submit new and material evidence to the Appeals Council. 20 C.F.R. §§404.970(b), 416.1470(b). However, the district court is permitted to consider the new evidence that was before the Appeals Council only if the Council has accepted the case for review and has made a decision on the merits, based on all the evidence before it.  *Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993).  To hold otherwise would change the role of a reviewing court to that of an ALJ, requiring the court to sort through and weigh the new evidence.  *Eads*, 983 F.2d 817.

In *Eads*, the Seventh Circuit addressed a situation where a claimant introduced a doctor's letter that stated for the first time that the claimant could not sit for more than a half hour. The letter was submitted on a request for review to the Appeals Council.  The Appeals Council refused to review the ALJ's decision, and the district court refused to consider the letter because it had not been before the ALJ.  *Eads*, 983 F.2d at 816.

Therefore, the ALJ here cannot be faulted for having failed to review new evidence that was not before her.

Biggs also can request that the district court remand the case to the Social Security Administration, but only upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate the evidence. 42 U.S.C. §405(g). "'New' evidence is evidence 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Jens*, 347 F.3d at 214 (*citing **Sample v. Shalala***, 999 F.2d 1138, 1144 (7th Cir. 1993)) (*quoting **Sullivan v. Finkelstein***, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)). Evidence is material if there is a "'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered." *Jens*, 347 F.3d at 214 (*quoting **Perkins v. Chater***, 107 F.3d 1290, 1296 (7th Cir. 1997)).

Biggs did not submit Dr. Newton's reports, including the GAF score of 55 indicating moderate symptoms, until she requested review by the Appeals Council. Biggs also submitted additional evidence to support a finding that she suffered functional limitations from her mental disorder. However, Biggs has failed to show that the information contained in the additional evidence was either new or material.

41

In the additional evidence, Biggs submitted Dr. Newton's reports from 2009, dated May 2, May 19, June 9, June 23, and July 7, and reports from Hunte from 2009 dated May 11, May 28, June 11, June 25, July 2, and July 9, all of which pre-date the administrative hearing. Biggs also submitted Hunte's reports from 2009 dated July 16, July 23, August 6, August 27, September 10, September 21, and October 5, all of which were prepared after the hearing, but pre-date the ALJ's decision. (Tr. 817-823) Because this information was available to Biggs prior to the time the ALJ issued her decision, this information failed to meet the "new evidence" standard as set forth above. The additional evidence also was inadmissible because Biggs failed to show good cause for failing to seek out and submit the reports prior to the date the ALJ issued her opinion. The evidence was untimely submitted and does not provide grounds for remand.

Biggs did submit some evidence to the Appeals Council that was prepared after the ALJ issued her decision. Hunte prepared reports dated December 14, 2009, December 28, 2009, and January 6, 2010, assigning Biggs GAF scores of 40 and 43. When rendering her decision, the ALJ had a report from December 2006 prepared by the consulting psychiatrist, Dr. Buonanno, assigning Biggs a GAF rating of 49. (Tr. 637) Hunte also had assigned Biggs a GAF score of 40 in December 2008. (Tr. 704) All of these GAF scores,

both new and old, fell within the same range, indicating serious symptoms. *See* Am. Psychiatric Ass'n, *Diagnosis and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV-TR). Evidence that was repetitious of that which was before the ALJ at the time she issued her decision was not material and would not affect the outcome of the case. The ALJ previously considered GAF scores within the range reported on Hunte's new report, and found that, based on substantial evidence of record, Biggs did not satisfy Listing 12.00(C). Therefore, Biggs has not proven that consideration of a GAF score, one that previously was taken into account, would have affected the outcome of her claim.

Biggs' second challenge concerns the ALJ's credibility determination. The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is

complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "history, the signs and laboratory findings, and statements from [the claimant], [the claimant's] treating or nontreating source, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt*, 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed de-
> scriptions of the claimant's daily activities
> by directing specific inquiries about the
> pain and its effects to the claimant. She

must investigate all avenues presented that
relate to pain, including claimant's prior
work record, information and observations by
treating physicians, examining physicians,
and third parties. Factors that must be
considered include the nature and intensity
of the claimant's pain, precipitation and
aggravating factors, dosage and effectiveness
of any pain medications, other treatment for
relief of pain, functional restrictions, and
the claimant's daily activities. (internal
citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
1994)

*See also* *Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir.
2001).

In addition, when the ALJ has discounted the claimant's
description of pain because it was inconsistent with the objec-
tive medical evidence, she must make more than "a single, conclu-
sory statement . . . . The determination or decision must contain
specific reasons for the finding on credibility, supported by the
evidence in the case record, and must be sufficiently specific to
make clear to the individual and to any subsequent reviewers the
weight the adjudicator gave to the individual's statements and
the reasons for that weight." SSR 96-7p, at *2. *See* *Zurawski*,
245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir.
1995) (finding that the ALJ must articulate, at some minimum
level, his analysis of the evidence). She must "build an accu-
rate and logical bridge from the evidence to [her] conclusion."

*Zurawski*, 245 F.3d at 887 (*quoting* **Clifford v. Apfel**, 227 F.3d
863, 872 (7th Cir. 2000)).  When the evidence conflicts regarding
the extent of the claimant's limitations, the ALJ may not simply
rely on a physician's statement that a claimant may return to
work without examining the evidence the ALJ rejected.  *See* **Zuraw-
ski**, 245 F.3d at 888 (*quoting* **Bauzo v. Bowen**, 803 F.2d 917, 923
(7th Cir. 1986)) ("Both the evidence favoring the claimant as
well as the evidence favoring the claim's rejection must be
*examined*, since review of the substantiality of evidence takes
into account whatever in the record fairly detracts from its
weight.") (emphasis in original).

The ALJ considered the evidence and found that Biggs'
medically determinable impairments reasonably could have been
expected to cause the symptoms but that the statements concerning
intensity, persistence, and limiting effects of the symptoms were
not credible because they were inconsistent with the residual
functional capacity assessment.  (Tr. 19)  Biggs argues that the
ALJ selectively reviewed the evidence and did not consider the
difficulties that she was having in performing her daily activi-
ties.  The ALJ's credibility determination must be assessed by
considering her entire explanation.  In the same section, the ALJ
noted that Biggs had not been hospitalized for treatment of pain
or the underlying condition.  (Tr. 20)  She went on to review

other medical evidence stating that Biggs was reported to be oriented, alert, and engaged at most mental health appointments. She cited Dr. Hale's notes that Biggs reported a high level of control over her life and pain experience. Biggs had variable responses to touching during examinations, maladaptive pain behaviors, and changes of gait observed after one of the examinations, which was inconsistent with her statements regarding the nature and intensity of her pain. (Tr. 20)

The ALJ also evaluated Biggs' intensity, persistence, and limiting effects of her symptoms to determine the extent that they interfered with her ability to do basic work activities. Several doctors were prevented from completing examinations for full range of motion, but a friend physically assisted Biggs without any complaints of pain. The ALJ noted that Biggs' improvement of gait at the conclusion of an examination further illustrated the inconsistencies of reports and the level of limitations which she demonstrated. With respect to performing daily activities, the ALJ found that Biggs lived with her parents, who did all the housework except laundry, but that there was no indication that her parents did housework due to Biggs' impairment. (Tr. 20)

Biggs further argues that the additional evidence she submitted supported her testimony of her limitations. Biggs

first cited a report of Dr. Ramos dated January 19, 2010, which stated that Biggs described her pain as sharp, shooting, stabbing, piercing, burning, and aching. Biggs also cited a letter from Hunte, which described her depression as having been present for a substantial period of time. Lastly, Biggs has cited to a letter from her parents and has provided her own assessment regarding the extent of her pain and her limitations. Biggs argues that the ALJ failed to consider the entire record, but each of these post-dated the ALJ's decision. Therefore, the ALJ could not have used them in determining Biggs' credibility.

Lastly, Biggs argues that the ALJ erred in holding that she was capable of past relevant work. Biggs argues that the ALJ's decision failed to address whether the jobs listed in the opinion actually were past relevant jobs. The ALJ specifically identified that Biggs was capable of performing past relevant work as a dispatcher and administrative assistant-training. (Tr. 21) At the hearing, the ALJ asked the VE to describe Biggs' former jobs in the last 15 years. (Tr. 51) The VE identified the administrative assistant job and communications officer job. (Tr. 51) The ALJ based her opinion from the testimony of the VE.

Further, Biggs argues that the ALJ failed to address whether she performed the jobs long enough to qualify as past relevant work, whether Biggs' earnings for the jobs qualify for past rele-

vant work, and whether the jobs described were performed within 15 years of the date of last work. First, "work experience applies when it was done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. §404.1565(a). Biggs worked as an administrative assistant from November 1996 through April 1999, and a communications officer from 1991 to 1996. (Tr. 153) Both jobs were within 15 years of the date last worked in October of 2004. (Tr. 32) "If [the claimant has] no work experience or worked only 'off-and-on' or for brief periods of time during the 15-year period, we generally consider these do not apply." 20 C.F.R. §404.1565(a). Biggs did not work on-and-off during the 15 years prior to the date she last worked, as the record showed that she worked as an administrative assistant for about two and one half years and a communications officer for five years. (Tr. 153) The record also showed that Biggs made at least $17,000 per year from 1991 to 1999. The ALJ addressed the analysis of past relevant work in her decision as part of step four. (Tr. 14)

————————————

Because the ALJ did not err in finding that Biggs' mental impairment was not severe and provided a thorough explanation for her credibility determination, her decision is supported by

substantial evidence.  It is therefore **RECOMMENDED** that the decision of the ALJ be **AFFIRMED.**

Pursuant to 28 U.S.C. §636(b)(1), the parties shall have fourteen (14) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court, with extra copies e-mailed to the Chambers of the Honorable Theresa L. Springmann, Judge of the United States District Court, Fort Wayne Division, and the Chambers of United States Magistrate Judge Andrew P. Rodovich, Hammond Division.  The failure to file a timely objection will result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals.  *Willis v. Caterpillar, Incorporated*, 199 F.3d 902, 904 (7th Cir. 1999); *Johnson v. Zema Systems Corporation*, 170 F.3d 734, 739 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corporation*, 882 F.2d 258, 260-61 (7th Cir. 1989); *United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir. 1988); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

ENTERED this 1st day of December, 2011

s/ ANDREW P. RODOVICH
United States Magistrate Judge